# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY

PEOPLE OF THE STATE OF NEW YORK, by Letitia James, Attorney General of the State of New York,

Plaintiffs,

- against -

3M COMPANY; EIDP, INC.; THE CHEMOURS COMPANY, INC.; THE CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; DUPONT DE NEMOURS, INC.,

Defendants.

**COMPLAINT**

**Index No. ____________**

## TABLE OF CONTENTS

NATURE OF THE ACTION .......... 1

PARTIES .......... 5

JURISDICTION AND VENUE .......... 10

LEGAL FRAMEWORK .......... 10

A. Protection of the State's Natural Resources Under the New York State Constitution and Statutory Law .......... 10

B. Public Nuisance Under New York Common Law .......... 12

C. Strict Products Liability: Failure to Warn Under New York Common Law .......... 12

D. New York General Business Law § 349 .......... 13

E. New York General Business Law § 350 .......... 14

F. New York Executive Law § 63(12) .......... 14

FACTS .......... 15

A. Characteristics of Defendants' PFAS in Consumer Products and Pathways to Humans and the Environment .......... 15

i. The Toxic, Persistent, and Bioaccumulative Characteristics of Defendants' PFAS in Consumer Products .......... 15

ii. Pathways of Defendants' PFAS From Consumer Products to Humans and the Environment .......... 18

B. Defendants' Manufacture, Marketing, and Sale of PFAS for Use in Consumer Products, Despite Their Knowledge of the Threats Posed by These Products .......... 21

i. Defendants Have Known for Decades that Certain PFAS Pose Severe Health and Environmental Risks .......... 21

a. 3M's Knowledge .......... 21

b. DuPont Defendants' Knowledge .......... 24

ii. Despite Their Knowledge of the Risks, Defendants Continued to Manufacture and Sell PFAS for Consumer Products and Deceived Consumers and the Public About Those Risks .......... 27

a. 3M's PFAS in Consumer Products and Its Deception .......... 28

b. DuPont Defendants' PFAS in Consumer Products and Their Deception ... 35

C. The Costs Incurred by the State in Addressing Contamination Caused by Defendants' PFAS in Consumer Products ... 45

i. Protecting New Yorkers from Contaminated Drinking Water ... 46

ii. Identifying, Investigating, and Mitigating Environmental Contamination ... 52

iii. Protecting New Yorkers Against PFAS Exposure Through Consumption of Fish Caught in New York ... 58

D. The Enduring Damage to New York's Natural Resources ... 60

FIRST CAUSE OF ACTION

Public Nuisance ... 62

SECOND CAUSE OF ACTION

Strict Products Liability: Failure to Warn ... 63

THIRD CAUSE OF ACTION

Deceptive Acts or Practices in Violation of New York General Business Law § 349 ... 64

FOURTH CAUSE OF ACTION

Abusive Acts or Practices in Violation of New York General Business Law § 349 ... 65

FIFTH CAUSE OF ACTION

Unfair Acts or Practices in Violation of New York General Business Law § 349 ... 66

SIXTH CAUSE OF ACTION

False Advertising in Violation of New York General Business Law § 350 ... 67

SEVENTH CAUSE OF ACTION

Repeated and Persistent Fraudulent Acts in Violation of New York Executive Law § 63(12) ... 67

EIGHTH CAUSE OF ACTION

Repeated and Persistent Illegality in Violation of New York Executive Law § 63(12) ... 68

Plaintiffs, the People of the State of New York, by their Attorney, Letitia James, Attorney General of the State of New York, as and for their Complaint against the 3M Company ("3M"), and against EIDP, Inc., The Chemours Company, Inc., The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. (collectively, the "DuPont Defendants"), allege upon information and belief as follows:

## NATURE OF THE ACTION

1. As a consequence of defendants' manufacture, production, marketing, and sale of per- and polyfluoroalkyl substances ("PFAS") for use in consumer products, the State of New York faces threats to human health, widespread environmental contamination, and damage to natural resources on an unprecedented scale.

2. Long after they knew their PFAS were toxic, defendants manufactured and sold these compounds for use in consumer products – including personal, family, and household products like Stainmaster carpets, Scotchgard stain-repellent sprays, grease-resistant coatings for food packaging, cosmetics, and personal care items – that defendants knew would be sold, used, and disposed of in New York, thereby exposing people to PFAS and releasing PFAS into New York's environment.






3. As a result of defendants' conduct, PFAS – including but not limited to perfluorooctane sulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA"), perfluorobutane sulfonic acid ("PFBS"), 6:2 fluorotelomer alcohol ("6:2 FTOH"), and perfluorohexanoic acid ("PFHxA") – are in the water we drink, the soil that sustains our crops, the fish we catch, and the air we breathe.

4. These and certain other PFAS are highly resistant to degradation in the environment, travel easily through water and air, and bioaccumulate in humans, plants, and animals.

5. For decades, New Yorkers have been exposed directly to defendants' PFAS through the use of consumer products treated with these compounds.

6. Moreover, the use of defendants' PFAS in consumer products also led to widespread environmental contamination. Substantial quantities of PFAS have been released into residential drains and sewage systems through everyday activities, such as when consumers wash household fabrics or other surfaces treated with PFAS, or when they use personal care products containing PFAS. Similarly, PFAS have been widely released into the environment through the disposal of consumer products containing PFAS in landfills.

7. People exposed to defendants' PFAS suffer various negative health effects, including higher risks of certain cancers, adverse pregnancy outcomes, liver disease, endocrine disruption, and other increased risks.

8. As a result of defendants' conduct, the State and its agencies have shouldered a significant administrative and financial burden to reduce New

Yorkers' exposure to harmful PFAS.

9. First and foremost, this has meant investigating, identifying and addressing instances of drinking water that is already contaminated. The State has installed thousands of point-of-entry treatment systems and transitioned many New York residents from contaminated private wells to public water systems, among other actions.

10. The State has also undertaken wide-ranging investigative and mitigation efforts to address environmental contamination from consumer products containing defendants' PFAS before it reaches drinking water, food sources, and vulnerable environments.

11. Contamination from consumer products containing defendants' PFAS has also inflicted long-lasting harm on the natural resources of the State; New York's groundwater, surface water, sediments, and soils, as well as the State's fish and wildlife have all been adversely impacted. And, despite the State's extensive efforts, some of these harms cannot be remedied in the near term. Instead, these contaminants remain widespread in New York's environment, and generations of New Yorkers will be deprived of the full benefit of their natural resources.

12. Defendants' failure to provide transparent information regarding the identity and characteristics of the PFAS used in the manufacture of consumer products has further complicated the State's efforts to address the contamination, shifting an even greater technical, financial, and administrative burden onto the State.

13. Moreover, as the State and its agencies have taken on the tasks necessary to investigate and address PFAS contamination, defendants have failed to take any material steps to abate the public nuisance that they created and to which they have contributed for decades.

14. On the contrary, defendants concealed their knowledge that certain PFAS were persistent, bioaccumulative, and toxic, and that the use of these substances in consumer products was leading to direct human exposure, widespread environmental contamination, and long-term threats to public health.

15. Even when defendants announced in the 2000s that they would phase out their manufacture and use of two specific PFAS, namely PFOS and PFOA, in consumer products, defendants failed to warn consumers and the public against using the products that were already in homes and that remained on store shelves. Instead, defendants deceptively reassured the public and consumers that these products were "safe."

16. Defendants also failed to warn consumers or the public that they were merely replacing those two compounds with slightly different PFAS that bore very similar characteristics to PFOA and PFOS and posed similar long-lasting threats to human health and the environment.

17. The State accordingly files this action to hold defendants liable for the harm caused by their manufacture, production, marketing, and sale of harmful PFAS for use in consumer products. Through this conduct, 3M and the DuPont Defendants created and contributed to the existence of a public nuisance that has

injured, and continues to injure, New Yorkers. 3M and the DuPont Defendants failed to warn the public and consumers about the risks posed by the use of their PFAS in consumer products. 3M's and the DuPont Defendants' conduct regarding these products also violated New York General Business Law §§ 349 and 350, as well as New York Executive Law § 63(12).

18. As used in this Complaint, references to specific PFAS include the chemicals themselves, as well as all of their salts, ionic states, acid forms, and precursors (i.e., chemical compounds that have the potential to break down, degrade, or transform into the specific PFAS). The State reserves its right to identify additional harmful PFAS used in the manufacture of consumer goods through discovery and as the science and research regarding PFAS develops.

19. This action is brought in the State's sovereign and proprietary capacities, as *parens patriae* and representative of all residents and citizens of New York. As trustee, owner, and guardian of the State's natural resources, the State seeks to hold defendants to account for their harmful and unlawful conduct.

## PARTIES

### Plaintiffs

20. The Attorney General of the State of New York, on behalf of the People of the State of New York, brings this suit to protect the health and interests of citizens and residents, to protect public lands held in trust by the State, to protect land in which the State has property interests, and to protect all natural resources of the State. This action is brought pursuant to the Attorney General's common law and statutory authority, including Article 22-A of the New York General Business

Law and Article 63 of the New York Executive Law.

**Defendants**

21. Defendant 3M Company is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144. 3M manufactured PFAS for use in consumer products for sale in New York. 3M did business in the State and knew or should have known that these consumer products would be purchased, used, and disposed of in New York in a manner that would threaten human health and adversely affect the State's environment, natural resources, and property.

22. 3M's manufacture of PFAS for use in consumer products, as well as the marketing, production, and sale of consumer products containing PFAS, led to, and continues to lead to, widespread releases of PFOS, PFOA, PFBS, and other PFAS in the State.

23. Defendant EIDP, Inc., formerly known as E. I. du Pont de Nemours and Company and commonly referred to as "Old DuPont," is a Delaware corporation with its principal place of business at 1000 N. West Street, Suite 900, Wilmington, Delaware 19801. Old DuPont manufactured, produced, and sold PFAS for use in consumer products for sale in New York. Old DuPont did business in the State and knew or should have known that these consumer products would be purchased, used, and disposed of in New York in a manner that would threaten human health and adversely affect the State's environment, natural resources, and property.

24. Old DuPont's manufacture and production of PFAS for use in

consumer products, as well as the marketing and sale of consumer products containing PFAS, led to widespread releases of PFOA, 6:2 FTOH, PFHxA, and other PFAS in the State.

25. Defendant The Chemours Company is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19801. The Chemours Company was incorporated as a subsidiary of Old DuPont as of April 30, 2015. From that time until July 2015, The Chemours Company was a wholly owned subsidiary of Old DuPont. In July 2015, Old DuPont spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which included its PFAS business, along with associated environmental liabilities.

26. The Chemours Company manufactured, produced, and sold PFAS for use in consumer products for sale in New York. The Chemours Company did business in the State and knew or should have known that these consumer products would be purchased, used, and disposed of in New York in a manner that would threaten human health and adversely affect the State's environment, natural resources, and property.

27. The Chemours Company's manufacture and production of PFAS for use in consumer products, as well as the marketing and sale of consumer products containing PFAS, led to, and continues to lead to, widespread releases of PFOA, 6:2 FTOH, PFHxA, and other PFAS in the State.

28. Defendant The Chemours Company FC, LLC ("Chemours FC") is a

Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19898. Chemours FC operates as a subsidiary of The Chemours Company.

29. Chemours FC manufactured, produced, and sold PFAS for use in consumer products for sale in New York. Chemours FC did business in the State and knew or should have known that these consumer products would be purchased, used, and disposed of in New York in a manner that would threaten human health and adversely affect the State's environment, natural resources, and property.

30. Chemours FC's manufacture and production of PFAS for use in consumer products, as well as the marketing and sale of consumer products containing PFAS, led to, and continues to lead to, widespread releases of PFOA, 6:2 FTOH, PFHxA, and other PFAS in the State.

31. The Chemours Company and Chemours FC are collectively referred to throughout this Complaint as "Chemours."

32. Chemours assumed and/or succeeded to Old DuPont's liabilities for its performance chemical business, including its liabilities for the manufacture of PFAS for use in consumer products, and the marketing and sale of consumer products containing PFAS.

33. Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. Following the spinoff of Chemours, Old DuPont merged with The Dow Chemical Company (commonly referred to as "Old Dow") in August 2017 to

create DowDuPont Inc. ("DowDuPont"). Old DuPont and Old Dow each became wholly owned subsidiaries of DowDuPont. Since that time, DowDuPont effected a series of separation transactions, first to split its businesses into three independent, publicly traded companies, namely DowDuPont, Corteva, Inc., and Dow, Inc. On June 1, 2019, DowDuPont then changed its name to DuPont de Nemours, Inc. and is now commonly referred to as New DuPont.

34. New DuPont assumed and/or succeeded to Old DuPont's liabilities for its performance chemical business, including its liabilities for the manufacture of PFAS for use in consumer products, and the marketing and sale of consumer products containing PFAS.

35. Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business at 1000 N. West Street, Suite 900, Wilmington, Delaware 19801. Corteva was initially formed in February 2018 to serve as the holding company for DowDuPont's agriculture business. At all relevant times, Corteva has been the direct parent of Old DuPont.

36. Corteva assumed and/or succeeded to Old DuPont's liabilities for its performance chemical business, including its liabilities for the manufacture of PFAS for use in consumer products, and the marketing and sale of consumer products containing PFAS.

37. Any and all references to a defendant or defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named defendants in addition to those expressly identified in the Complaint.

## JURISDICTION AND VENUE

38. This Court has jurisdiction pursuant to New York Constitution article VI, § 7(a) and Judiciary Law § 140-b. No claim or substantial question of federal law is alleged.

39. This Court has personal jurisdiction over 3M and the DuPont Defendants pursuant to New York Civil Practice Law and Rules ("C.P.L.R.") §§ 301 and 302.

40. Plaintiffs designate venue in Albany County pursuant to C.P.L.R. § 509, and venue lies there pursuant to C.P.L.R. § 503(a) as plaintiffs reside in the county and have their principal offices there.

## LEGAL FRAMEWORK

### A. Protection of the State's Natural Resources Under the New York State Constitution and Statutory Law

41. New York's Constitution provides that "[t]he policy of the state shall be to conserve and protect its natural resources and scenic beauty and encourage the development and improvement of its agricultural lands for the production of food and other agricultural products." NY Const., art XIV, § 4. The Constitution further decrees that the legislature, in implementing this policy, "shall include adequate provision for the abatement of air and water pollution . . . , the protection of agricultural lands, wetlands and shorelines, and the development and regulation of water resources." *Id.*

42. Under its "Green Amendment," the New York Constitution further provides that "[e]ach person shall have a right to clean air and water, and a

healthful environment." NY Const., art I, § 19.

43. The sovereign power to regulate and control the water resources of New York is vested exclusively in the State. N.Y. Env't Conservation Law ("E.C.L.") § 15-0103(1).

44. Recognizing the importance of preventing contamination of New York's waters, the State legislature determined that the "unreasonable, uncontrolled and unnecessary interference" with the waters of New York "create[s] hazards to the health, safety and welfare of the people of the state causing great economic loss . . . increased costs of water purification and treatment . . . the destruction and failure of natural propagation of fish and aquatic resources, and the loss of water for domestic, industrial, navigational, municipal, agricultural, recreational and other beneficial uses and purposes." E.C.L. § 15-0103(9).

45. It is therefore the policy of the State to maintain "[r]easonable standards of purity of the waters of the state consistent with public health and public enjoyment thereof . . . and to that end require the use of all known available and reasonable methods to prevent and control the pollution of the waters of the state." E.C.L. § 17-0101.

46. To implement these policies, the New York Public Health Law ("P.H.L.") tasks the New York State Department of Health ("DOH") with "supervis[ing] and regulat[ing] the sanitary aspects of water supplies and sewage disposal and control the pollution of waters of the state." P.H.L. 201(l).

47. Complementing DOH's role, the New York State Department of

Environmental Conservation ("DEC") is responsible for setting water quality standards and guidance values necessary to protect the State's waters. E.C.L. § 17-0301.

48. The State also owns the fish and wildlife in New York and holds them "for the use and enjoyment of the people of the state, and the state has a responsibility to preserve, protect and conserve such terrestrial and aquatic resources from destruction and damage and to promote their natural propagation." E.C.L § 15-0103(8).

**B. Public Nuisance Under New York Common Law**

49. Under New York common law, a public nuisance claim exists for conduct or omissions that offend, interfere with, or cause damage to the public in the exercise of rights common to all in a manner such as to offend public morals, interfere with use by the public of a public place, or endanger or injure the property, health, safety, or comfort of a considerable number of persons. *Copart Indus., Inc. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 568 (1977).

**C. Strict Products Liability: Failure to Warn Under New York Common Law**

50. A product is considered "defective," and the manufacturer liable for harm caused by the product, if the product is not accompanied by adequate warnings for the use of the product. *Eighth Judicial Dist. Asbestos Litig.*, 33 N.Y.3d 488, 493-94 (2019).

51. A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known, and a

manufacturer similarly has a duty to warn of the danger of unintended uses of a product provided these uses are reasonably foreseeable. *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237 (1998).

**D. New York General Business Law § 349**

52. New York General Business Law § 349 prohibits unfair, deceptive, or abusive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this State. The law applies to "virtually all economic activity, and [its] application has been correspondingly broad." *Plavin v. Group Health Inc.*, 35 N.Y.3d 1 (2020).

53. A deceptive act or practice is a "representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances." *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 348 (1999) (internal quotations omitted).

54. Under the General Business Law, an act or practice is "abusive" when it "materially interferes with the ability of a person to understand a term or condition of a product or service." G.B.L. § 349(a)(2)(i). Independently, an act or practice is also abusive when it "takes unreasonable advantage" of (a) "a lack of understanding on the part of a person of the material risks, costs, or conditions of a product or service," or (b) "the inability of a person to protect such person's interests in selecting or using a product or service," or (c) "the reasonable reliance by a person on a person engaging in the act or practice to act in the relying person's interests." *Id.* § 349(a)(2)(ii).

55. An act or practice is "unfair" when "it causes or is likely to cause

substantial injury which is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition." *Id.* § 349(1).

56. The Attorney General is authorized to bring an action to enjoin a person or entity from engaging in unfair, deceptive, or abusive acts or practices in the conduct of business and to seek restitution of any money or property obtained directly or indirectly by any such unlawful acts or practices. *Id.* § 349(b)(1).

**E. New York General Business Law § 350**

57. New York General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in the State. G.B.L. § 350.

58. The term "false advertising" refers to advertising that "is misleading in a material respect," including the failure to reveal material facts. *Id.* § 350-A.

**F. New York Executive Law § 63(12)**

59. Executive Law § 63(12) authorizes the Attorney General to sue to enjoin "repeated fraudulent or illegal acts" and "persistent fraud or illegality" in "the carrying on, conducting or transaction of business" and to recover restitution and damages for such conduct. "Illegal" conduct under Executive Law § 63(12) includes the violation of any state, federal, or local law or regulation. "Fraud" and "fraudulent" refer to "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

60. In an action or proceeding pursuant to Executive Law § 63(12) to enjoin repeated or persistent illegality, the Attorney General may also seek

penalties for underlying statutory violations.

## FACTS

### A. Characteristics of Defendants' PFAS in Consumer Products and Pathways to Humans and the Environment

#### i. The Toxic, Persistent, and Bioaccumulative Characteristics of Defendants' PFAS in Consumer Products

61. PFAS are a class of synthetic chemicals that consist of chains of carbon atoms bonded to fluorine atoms. They are referred to as "forever chemicals" because of the enduring nature of these carbon-fluorine bonds. They are highly stable, resistant to chemical breakdown, and repel oils and water. PFAS are manmade and do not exist naturally in the environment.

62. Different types of PFAS can be distinguished by the number of carbon atoms in the chain. For instance, PFOA and PFOS contain chains of eight carbon atoms and are identified as "C-8" compounds. PFHxA, on the other hand, is a C-6 compound because it contains a chain of six carbon atoms; PFBS is a C-4 compound.

63. Defendants have used two main manufacturing processes to produce PFAS, electrochemical fluorination and telomerization.

64. The electrochemical fluorination process was first used by 3M in the late 1940s to mass produce PFAS. 3M used this process to create both PFOS and PFOA for decades, but it principally manufactured PFOS. Approximately 95% of the PFAS manufactured by 3M were PFOS and PFOS precursors, and roughly 5% were PFOA and its precursors.

65. DuPont Defendants used the telomerization process to manufacture

their PFAS, including PFOA and its precursors. Old DuPont developed this process in the 1940s and began commercial production of PFAS using this method in the 1970s, significantly increasing its production the early 2000s.

66. The use of the electrochemical fluorination process creates PFAS with different structural arrangements than the use of the telomerization process.

67. Due to their stability and chemical structure, PFAS have been used for decades in the manufacture of a wide variety of consumer products, including water-repellent clothing, water- and stain-resistant fabric treatments, adhesives, food packaging, cosmetics, heat-resistant and non-stick cooking surfaces, sealants, paint, and varnish.

68. The chemical structures and physical properties of many PFAS cause them to be: (i) persistent, (ii) highly mobile in the environment, (iii) bioaccumulative and biomagnifying, and (iv) toxic.

69. PFAS are persistent, or degrade into persistent substances, because their perfluorinated carbon chains resist environmental degradation and biodegradation in living organisms.

70. PFAS can also be highly mobile in the environment because they do not easily bind to soil. When it rains, these compounds leach into groundwater or enter surface runoff and can travel significant distances from their original source.

71. Because they are stable once ingested, certain PFAS also bioaccumulate in living organisms. Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is

eliminated by metabolism and excretion. For instance, as humans are exposed to these chemicals, through consumption of contaminated drinking water or food, inhalation of contaminated air, or absorption through skin, the concentration of these chemicals in their blood and organs increases. PFAS can also bioaccumulate by crossing the placenta from mother to fetus and by passing to infants through breast milk.

72. Certain PFAS are also biomagnifying. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases up the food chain, such as when predatory fish consume significant quantities of contaminated prey over their lifetimes.

73. Many PFAS are toxic and pose serious health risks to exposed humans and animals.

74. Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high cholesterol.

75. Human health effects associated with PFOA exposure include kidney and testicular cancer, thyroid disease, high cholesterol, ulcerative colitis, liver damage, and pregnancy-induced hypertension (also known as preeclampsia).

76. In laboratory testing on animals, PFOS and PFOA have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

77. As for PFBS, animal studies have shown that it has adverse health

effects on the thyroid, reproductive organs and tissues, developing fetuses, and kidneys following oral exposure. The thyroid and kidney are particularly sensitive to PFBS.

78. In laboratory studies, 6:2 FTOH was shown to be a developmental toxicant, disrupting reproductive hormones and increasing the risk of adverse pregnancy outcomes. It also can cause damage to the liver, the pancreas, and teeth. Studies also indicate that 6:2 FTOH can promote the growth of breast cancer cells and similarly can increase estrogenic activity in human cells.

79. PFHxA similarly has been shown in laboratory studies to pose health risks, including liver damage, adverse effects on red blood cell counts and reproduction, negative effects on hormone levels, and adverse pregnancy outcomes.

### ii. Pathways of Defendants' PFAS From Consumer Products to Humans and the Environment

80. The use of PFAS in consumer products exposes humans and the environment to these compounds through multiple pathways.

81. People can be exposed to PFAS both directly, through the use of consumer products, and indirectly, through the environmental contamination caused by these products.

82. For instance, carpets, upholstered furniture, and other consumer products treated with PFAS can contaminate indoor air and household dust with PFAS. Researchers have estimated that approximately 50% of PFAS-based carpet treatment can migrate to air and dust as the carpet is walked on and vacuumed over a typical nine-year product lifespan. This contaminated household dust has

been identified as a significant contributor to human exposure to PFAS.

83. Carpets have been identified as a primary exposure pathway to PFAS for infants and toddlers in particular because they spend substantial time lying, playing, and crawling on carpeting. Researchers have found that children's textiles and carpets contained high levels of PFAS.

84. People can also be exposed to PFAS through the use of after-market carpet and upholstery cleaning and treatment products.

85. Similarly, when PFAS are used in food packaging, cosmetics, and other personal care items, consumers are directly exposed to PFAS through ingestion or absorption through the skin. PFAS can also migrate into food when food packaging (such as a fast-food wrapper or a microwave popcorn bag) is treated with grease-resistant coating containing PFAS, particularly when the food is hot or when the packaging is microwaved.

86. The use, maintenance, cleaning, and disposal of consumer goods containing PFAS are also significant sources of environmental contamination.

87. For instance, PFAS are released into residential drains and sewage systems when household fabrics or other surface treatments containing PFAS are washed, or when personal care products containing PFAS are used. One study estimated that repeated steam cleaning of carpets treated with PFAS would remove 45% of the carpet treatment over the lifetime of the carpet.

88. Consumer products containing PFAS also release PFAS into the environment when they are disposed of in landfills.

89. Because conventional municipal wastewater treatment plants and private septic systems are not designed to degrade, filter out, or remove these compounds, PFAS in residential drains, sewage systems, or landfill leachate are not removed before the water is discharged into surface waters or leaches into groundwater aquifers. Once in groundwater or surface water, PFAS can contaminate drinking water and bioaccumulate in fish.

90. The presence of PFAS from consumer products in municipal wastewater also leads to soil contamination through the use of biosolids. Biosolids, sometimes referred to as sewage sludge, are the solid or semi-solid organic materials resulting from the treatment of wastewater carried through sewer lines from homes and businesses. Following treatment of wastewater, the liquid effluent is typically discharged to a nearby receiving water (e.g., a stream or river), while the biosolids are removed from the treatment plant for beneficial use or disposal. If PFAS are present in the wastewater, the PFAS wind up in the liquid effluent and the biosolids.

91. Biosolids can be beneficially used, for example as a nutrient rich fertilizer, but when the biosolids contain certain PFAS, crops can absorb these PFAS or their degradation products from the soil. Moreover, rain or snowmelt can wash the PFAS through the soil into the groundwater, further threatening natural resources.

92. Additionally, light manufacturing facilities that operate to treat consumer products with PFAS coatings, such as those applying stain-repellent

coatings to fabrics, release PFAS into the atmosphere. Once airborne, these compounds can travel long distances before returning to the surface via rain, snow, or dust.

**B. Defendants' Manufacture, Marketing, and Sale of PFAS for Use in Consumer Products, Despite Their Knowledge of the Threats Posed by These Products**

93. Defendants knew for decades that their PFAS were toxic and posed substantial health and environmental risks, but they continued to manufacture, produce, market, and sell these PFAS for use in consumer products, deceptively claiming these products were safe and appropriate for use in homes.

**i. Defendants Have Known for Decades that Certain PFAS Pose Severe Health and Environmental Risks**

a. <u>3M's Knowledge</u>

94. 3M was aware of and repeatedly acknowledged internally the substantial risks posed by PFAS as early as the 1960s.

95. A 1963 3M report described some PFAS as being stable in the environment and "completely resistant to biological attack." The same report also confirmed that 3M knew the chemicals to be "toxic."

96. By the 1970s, 3M knew that PFOA and PFOS were persistent, bioaccumulative, and biomagnifying, in addition to being toxic.

97. In 1971, 3M acknowledged in an internal memo that large quantities of its PFAS used in textile and paper treatments were being sent to municipal landfills, that some portion of these PFAS would "be adsorbed by the soil," and that PFAS in groundwater "would be reason for concern."

98. 3M also learned in the 1970s that human exposure to its PFAS was not limited to people working at manufacturing sites or living in surrounding areas. In 1975, researchers contacted 3M scientists after finding compounds containing carbon-fluorine bonds in human blood samples from New York and Texas, suspecting that Teflon-branded cookware produced by Old DuPont and/or 3M's "Scotchgarded" brand fabric treatments were sources. In the conversation with one of the researchers, 3M "pled ignorance" but privately acknowledged that the compounds found by the researchers resembled the PFAS manufactured by 3M.

99. By 1976, 3M had confirmed the presence of PFAS – including both PFOS and PFOA – in the blood of its employees, and the company also found PFAS in blood samples from the general public.

100. In 1978, an internal 3M report warned that PFOS and PFOA are "likely to persist in the environment for extended periods." A 90-day animal study conducted by 3M in 1978 indicated that both PFOS and PFOA "should be regarded as toxic" and that the resulting "liver discoloration in rats associated with a blood level of 50 ppm suggests a possible human health problem." Another study by 3M showed that PFOA reduced the survival rate of fathead minnow fish eggs.

101. Other studies by 3M in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

102. In 1978, referencing the studies conducted on rats and mice exposed to 3M products containing PFOS, a 3M scientist suggested that the company should

expand the study to humans, particularly "3M employees exposed to 3M's skin protectants and carpet treatment products." The scientist noted that "if [PFOS] is found in these persons blood, then the public health issue becomes simply one of frequency and type of exposure to 3M products."

103. A 1979 internal 3M report stated that PFOS and PFOA were "more toxic than anticipated."

104. In 1979, an employee in 3M's medical department concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long-term chronic exposure."

105. In 1981, 3M moved 25 female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure." This decision was based on internal research showing that PFAS compounds were causing birth defects in rats.

106. In 1983, 3M scientists concluded that PFAS "give rise to concern for environmental safety," and an internal technical report acknowledged that PFOS discharged into wastewater "could be adsorbed by waste treatment sludge and eventually land applied with this sludge."

107. The company did not disclose these findings to the public or the State. On the contrary, although 3M's own scientists repeatedly recommended that the company undertake ecological risk assessments of PFOS and other PFAS from the late 1970s through the 1990s, 3M failed to do so until the late 1990s.

b. DuPont Defendants' Knowledge

108. Old DuPont similarly knew for decades that PFAS pose substantial dangers to public health and the environment.

109. By 1961, Old DuPont's researchers had concluded that PFOA was toxic, and Old DuPont's chief toxicologist warned in a memo to executives that products containing PFOA should be "handled with extreme care." As early as 1966, Old DuPont was aware that PFOA could leach into groundwater.

110. In 1975, DuPont scientists met with 3M to discuss the toxic effects of PFOA, and 3M shared the results of toxicity studies documenting enlarged livers in rats exposed to PFOA.

111. Like 3M, Old DuPont also learned in the 1970s that PFAS had been detected in human blood of people working at manufacturing sites or living in surrounding areas, and the company also became aware of the research showing that PFAS had been detected in blood bank samples from the general public living in New York and Texas.

112. In the 1970s, Old DuPont began monitoring the health of employees who were potentially being exposed to PFOA, subsequently confirming that people accumulate PFOA in their bodies, that the compound is toxic, and that "continued exposure is not tolerable." However, Old DuPont did not disclose any of its findings to the public or the State.

113. By at least 1981, Old DuPont had obtained a 3M study that documented birth defects in the eyes of unborn rats exposed to PFOA *in utero*. In response, Old DuPont moved all of its female workers away from areas where they

might come into contact with PFOA.

114. In April 1981, Old DuPont also began monitoring 50 of its female employees who had been exposed to PFOA. As Old DuPont's medical director Bruce Karrh explained in a memo, this monitoring was undertaken to "answer a single question: does C8 [PFOA] cause abnormal children?" Old DuPont's data showed that two of the seven pregnant workers exposed to PFOA had babies with eye and nostril defects, and a third baby was born with PFOA in the umbilical cord. Old DuPont abandoned the study rather than inform regulators or even its own employees.

115. In 1981, Old DuPont issued internal advice to its employees that women who had an "organic fluorine blood level above background [levels] should consult with their personal physician prior to contemplating pregnancy."

116. By the early 1980s, Old DuPont discovered PFOA contamination in drinking water around its Washington Works plant. Old DuPont corporate managers met in 1984 to discuss the company's options, including the potential "total elimination" of PFOA. But, despite acknowledging that the "legal and medical [departments] will most likely take [this] position of total elimination" of PFOA, the company rejected this approach. Instead, the company decided that "the issue which will decide future action is one of corporate image, and corporate liability." And the potential for corporate liability was viewed as minimal because it would only be "incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." Ultimately, concluding that

"none of the options developed are . . . economically attractive," the company decided to continue using PFOA and its precursors for consumer goods.

117. In 1988, Old DuPont began internally treating PFOA as a possible human carcinogen.

118. In 1991, Old DuPont researchers recommended a follow-up to the company's 1981 study of its employees who may have been exposed to PFOA. Old DuPont chose not to conduct the follow-up study until years later.

119. In 1999, Old DuPont received results from a study showing that C-8 caused monkeys to lose weight and increased their liver size. Even monkeys given the lowest doses suffered liver enlargement, and one became so ill it had to be euthanized.

120. In 2000, John R. Bowman, an Old DuPont in-house counsel, wrote an email to several colleagues expressing concern over Old DuPont's potential liability relating to PFOA, comparing it to litigation over an unrelated chemical and stating:

> I think we are more vulnerable than the MTBE defendants because many states have adopted a drinking water guideline for MTBE and it is not biopersistent. My gut tells me the biopersistence issue will kill us because of an overwhelming public attitude that anything biopersistent is harmful.
>
> We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives. [Bernard Reilly, another Old DuPont attorney] and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject. Our story is not a good one . . . .

121. In a 2001 e-mail, Reilly further described Old DuPont's response to the

issue as "[a] debacle at best."

**ii. Despite Their Knowledge of the Risks, Defendants Continued to Manufacture and Sell PFAS for Consumer Products and Deceived Consumers and the Public About Those Risks**

122. Despite knowing that their PFAS were persistent, bioaccumulated in living organisms, and were toxic, defendants continued to aggressively expand their manufacturing, production, marketing, and sale of PFAS for use in consumer products for decades, continuing in some cases to the present day. This conduct exposed, and continues to expose, people to these compounds and has caused ongoing releases into the environment. These PFAS included, but are not limited to, PFOS, PFOA, PFBS, 6:2 FTOH and PFHxA.

123. 3M did not phase out its manufacture of PFOS and PFOA (and their precursors) until 2002 and 2008, respectively.

124. Old DuPont did not phase out its manufacture of PFOA and its precursors until the mid-2010s.

125. Defendants also continued their deception, repeatedly reassuring consumers and the public that their consumer products were safe for household and family use and concealing the risks to the environment and human health.

126. Even when defendants did eventually phase out their manufacture and production of PFOS and PFOA and their precursors, they failed to warn consumers and the public about consumer products that were still for sale or already in their homes.

127. Defendants also concealed and failed to warn the public and consumers

that, in many instances, they merely replaced these compounds with other similar PFAS, including PFBS and 6:2 FTOH among others.

a. 3M's PFAS in Consumer Products and Its Deception

128. 3M is responsible for virtually all of the PFOS found in New York. It was the only company to manufacture PFOS and its precursors in the United States, and it was also the principal worldwide manufacturer of PFOS.

129. 3M manufactured PFOS and its precursors from approximately the 1940s until 2002. The company also manufactured PFOA and its precursors during this time frame, principally for sale to Old DuPont.

130. 3M's manufacture of PFAS for use in consumer goods began in the mid-1950s with its Scotchgard brand of stain- and water-repellents. In 1956, the company launched a PFOS-based Scotchgard treatment for wool fabrics and then rapidly expanded the product line to include aerosol fabric sprays, carpet cleaners, and stain-resistant finishes for home upholstery and leather. By the 1960s, these products were widely available in New York.

131. The company continued to expand the Scotchgard product line into specialized items, eventually offering water- and stain-repellent sprays specifically for outdoor gear and apparel, automotive interior protectors, wood sealers, and permanent-press treatments for clothing. By the 1970s, fabric treatments were the most common use of 3M's PFOS. The PFOS precursors used for these purposes were typically applied at 2-3% of the fiber weight for textiles and 15% for carpets.

132. Throughout these years, the Scotchgard products were widely advertised and available in New York. In 1982 – one year after 3M removed its

female employees from its production lines due to concerns about birth defects from PFOS exposure – a 16oz can of Scotchgard containing PFOS cost about $4 in New York City, and professional fabric finishers in the city would apply a Scotchgard treatment to wallpaper at $1 per yard.

133. 3M's Scotchgard products became a staple for treating carpets, furniture, linens, clothing, and more. By the end of the 1990s, ninety percent of La-Z-Boy branded stain-preventive fabrics were treated with Scotchgard. At that time, the Scotchgard brand generated approximately $300 million a year in revenue for 3M.




*Advertisement for Scotchgard-treated bed linens widely available for sale in New York in 1972.*

134. These Scotchgard fabric treatments directly threatened human health and caused the release of PFOS into the environment. Through everyday use, wear and tear, professional cleaning and disposal, Scotchgard fabric treatments would gradually wear away, releasing PFOS directly into homes and businesses, as well as into the environment. 3M knew that its Scotchgard aerosol fabric treatments in particular would wear away within months and advised consumers to reapply the product to fabrics and other surfaces in their homes on a regular basis.

135. Throughout these years, 3M continued to aggressively advertise and market Scotchgard, claiming they were appropriate for household and family use and failing to disclose information they knew regarding the risks to human health and the environment.

136. The Scotchgard branded products were not the only consumer products that 3M manufactured and sold containing PFOS and its precursors.

137. In the late 1960s, 3M began using PFOS precursors to produce waterproof and greaseproof coating for paper and cardboard under the brand name "Scotchban." Within a few years, 3M expanded the Scotchban product line to include a coating specifically for use on food packaging.

138. By the 1990s, the use of the Scotchban coating for food packaging had expanded to include a wide range of applications, including paper plates, microwave popcorn bags, pizza boxes, fast food wrappers, baking papers, pet food bags, and others. The amount of PFAS applied to food contact packaging, based on the dry weight of the fibers, was typically between 1-1.5% of the weight of the packaging.

139. Food packaging treated with the Scotchban product repelled grease and moisture, preventing water or grease from soaking through the paper.

140. However, because the Scotchban coating was also in direct contact with the food, the coating could leach into the food under various circumstances, such as when the food was heated. When disposed of in landfills, the coating similarly leached into the environment. And, when ingested or released into the environment, the PFOS precursors present in the Scotchban degraded into PFOS and other PFAS.

141. 3M also produced numerous other consumer goods containing PFOS, including automobile waxes, cleaners, denture cleaners, shampoos, floor polish, dishwashing liquids, and car wash products, often to lower surface tension and improve rinse-off capability. The company also manufactured paints, varnishes, dyes and inks, and certain carbonless copy paper using PFOS. Like the Scotchgard and Scotchban products, many of these products contributed to releases of PFOS into the environment.

142. During this time, 3M also sold its stain- and water-repellents containing PFAS to other companies that then used the repellents in their own consumer products for sale in New York. For instance, shoe and carpet businesses purchased 3M's stain-and water-repellents containing PFOS and/or PFOA and then applied those repellents to their products sold in New York.

143. Similarly, 3M sold PFAS to companies engaged in the manufacture of consumer products in New York, further contributing to PFAS contamination in the

State. For instance, 3M sold PFOS to chrome plating businesses operating in New York for use as a mist suppressant in those operations.

144. Despite its decades of research and awareness of the dangerous properties of its PFOS, 3M did not disclose that research to the U.S. Environmental Protection Agency ("EPA") until the late 1990s.

145. In May 2000, 3M announced it would "substantially" phase out the production of PFOS and its use in consumer goods by the end of year.

146. 3M's May 2000 announcement, however, did not warn consumers against using existing products found on store shelves or in homes. On the contrary, 3M continued its deception and told consumers and the public that Scotchgard was a "great product," that it "continue[d] to be safe," and that the PFOS posed no risk to humans. The company misleadingly attributed the removal of Scotchgard and other PFOS-containing consumer products from the market simply to the persistence of PFOS in the environment.

147. The company also chose not to disclose a list of consumer products, other than Scotchgard, that contained their PFOS. Neither then, nor thereafter, has 3M undertaken reasonable efforts to inform or protect consumers and the public from the risks posed by consumer products containing PFOS or its precursors.

148. Moreover, even as 3M phased out its manufacture of PFOS, the company merely replaced PFOS with different PFAS with somewhat shorter carbon chains. But, as 3M knew, these so-called "short-chain" PFAS pose many of the same threats to human health and the environment, including persistence.

149. For instance, to replace PFOS, 3M introduced PFBS – a very similar compound – and reformulated its Scotchgard products using this compound by 2002.

150. 3M failed to warn the public or consumers of the similarity between PFOS and their newer PFAS, including PFBS, and claimed that these new formulations were "safe" for decades.

**PFOS**



**PFBS**



F fluorine

C carbon

O oxygen

H hydrogen

S sulfur

151. Contrary to 3M assertions, animal studies have shown that oral exposure to PFBS has adverse health effects on the thyroid, reproductive organs and tissues, developing fetuses, and kidneys. The thyroid and kidney are particularly sensitive to PFBS. PFBS is also persistent in the environment, highly mobile, and bioaccumulates in living organisms. Notably, PFBS shows higher bioaccumulation in plants than PFOS.

152. As with the products containing PFOS before them, 3M expanded its use of PFBS and other new PFAS for use in a variety of consumer products

including stain- and water-repellents for carpets and other fabrics, coatings for food packaging, and cleaning products, among others.

153. In the 2000s, 3M also worked to control and distort the science on PFAS. For example, 3M provided millions of dollars in grants to a professor, John Giesy, who publicly presented himself as independent but worked behind the scenes for 3M. Mr. Giesy's goal, as expressed in a March 25, 2008, email, was to "keep 'bad' papers [regarding PFAS] out of the literature [because] otherwise in litigation situations they can be a large obstacle to refute."

154. In December 2022, 3M still claimed that all of its PFAS were "safe for [their] intended use," but announced that it would cease manufacturing all PFAS, including PFBS, by 2025 and that it would "work to discontinue" the use of PFAS across its product portfolio by the end of 2025. At the time of this announcement, 3M's annual net sales of manufactured PFAS were approximately $1.3 billion.

155. Once again, however, 3M did not warn the public or consumers against using consumer products that were already purchased and in their homes or were still available on store shelves. 3M again failed to undertake reasonable efforts to inform or protect consumers and the public from the risks posed by consumer products containing PFAS.

156. 3M also failed to meet its 2025 target, and an unknown number of 3M products are still manufactured or sold with the company's PFAS to this day.

157. Moreover, 3M continues to produce, market, and sell consumer products with PFAS-containing components manufactured by third parties. 3M has

committed only to "evaluat[ing] the availability and feasibility of adopting and incorporating third-party products into its product portfolio that do not contain PFAS." 3M has failed to identify these products to consumers or the public and has failed to warn consumers or the public about the risks posed by these products.

158. Ultimately, the secrecy with which 3M has operated, and continues to operate, prevents New York consumers and the public from identifying products manufactured with or containing PFAS. As a result, an unknown quantity of consumer products that contain defendants' PFAS are still being produced and/or sold in New York.

b. DuPont Defendants' PFAS in Consumer Products and Their Deception

159. DuPont Defendants similarly continued to manufacture and produce PFAS for use in consumer products despite their knowledge of the harmful characteristics of those products. DuPont Defendants also aggressively advertised and marketed these consumer products, claiming they were safe for household and family use and failing to disclose information they knew regarding the risks to human health and the environment.

160. Beginning with its Teflon brand in the 1950s and expanding quickly thereafter, Old DuPont utilized PFOA and other PFAS in the manufacture and production of nonstick coatings, fabric treatments, and a wide variety of other consumer products designed to provide stain- and water-repellent properties. These substances were integrated into thousands of consumer goods, ranging from cookware and food packaging to stain-resistant carpets and waterproof clothing.

161. Old DuPont initially purchased much of its PFOA and/or PFOA precursors from 3M. But when 3M announced in 2000 that it would phase out its PFOA manufacturing, Old DuPont increased its own PFAS manufacturing.

162. One of Old DuPont's first commercial uses of PFOA was in the manufacture of a fluoropolymer, polytetrafluoroethylene ("PTFE"), under the brand name Teflon. Old DuPont trademarked the PTFE compound in 1945 and introduced it to the consumer market in the 1950s. By the 1960s, still sourcing its PFOA from 3M, Old DuPont was producing and selling Teflon nonstick cookware to consumers across the country, including in New York.

163. Throughout the 1970s and 1980s, Old DuPont expanded the Teflon brand to a variety of other consumer products, fabric treatments, weather-resistant paints, tools, and certain hair products. These products were widely advertised and sold across the country, including in New York.

164. By 2003, the Teflon line of products provided Old DuPont with at least $100 million in profit annually, and the company was looking for ways to expand the product line. That year, the company invested $50 million to expand Teflon production and $20 million on an advertising campaign in the United States, including advertising in New York. In that advertising, Old DuPont continued its refrain that "[w]e are confident that there are no health effects associated with C-8 exposure," and that "C-8 is not a human health issue."

165. In the 1960s, Old DuPont also created a PTFE stain repellent under the brand ZePel for fabrics and apparel, which it manufactured until the 1990s.

The ZePel fabric treatment was initially only applied by fabric mills, but by 1964 was available to New York customers through professional fabric finishers.

166. Old DuPont's use of PFOA to manufacture Teflon and other PTFE products led to the release of PFOA into the environment in multiple ways. First, when PFOA was used as a processing aid in the manufacture of PTFE, small amounts of PFOA remained in the final product. When the consumer used or disposed of the product in New York, the PFOA was released.

167. In addition, the application of Old DuPont's PTFE to fabric and other consumer products often took place in light industrial facilities, including locations in New York. For this process, Old DuPont supplied PTFE to industrial facilities as an aqueous dispersion product (a mixture of PTFE particles suspended in a liquid). Because PFOA was used as a surfactant in the manufacturing of PTFE, the dispersion product frequently contained PFOA as a byproduct.

168. After Old DuPont supplied the PTFE dispersion product to these light industrial facilities, these facilities then immersed fabrics or fiber yarns in the liquid and heated them at high temperatures to ensure that the PTFE bonded to the fabric. This process, however, led to the release of PFOA through the discarded rinse water and/or through air emissions during the heating process.

169. One scientific study estimated that, by the mid-2000s, the manufacture and use of fluoropolymers – of which PTFE manufactured by Old DuPont for consumer products was dominant in the market – had contributed to the majority of the PFOA in the environment.

170. Old DuPont also began manufacturing stain- and grease-repellents using different PFOA precursors under the "Zonyl" brand name in the 1960s. The Zonyl product line initially included only fabric treatments, but Old DuPont subsequently expanded this brand to include everything from stone and tile sealants to grease-resistant coatings for paper and cardboard food packaging.

171. The Zonyl coating was used to line fast-food wrappers, pizza boxes, microwave popcorn bags, and packaging for a wide array of other foods.

172. Old DuPont also sold Zonyl products containing PFAS to third parties for use in cosmetics and personal care products. In 1999, for example, L'Oreal patented a skincare product that included the use of PFAS from Old DuPont's Zonyl product line.

173. Old DuPont's Zonyl products exposed humans and the environment to PFOA through degradation and migration. Not only did Zonyl products contain PFOA and its precursors as an impurity, but the Zonyl coating also broke down into PFOA and its precursors, among other compounds, when it was ingested, absorbed through the skin, or released into the environment through use or disposal of the product.

174. Particularly when Zonyl products were used as a coating for food packaging, the coating migrated into food under certain conditions, such as when the food was warmed.

175. By 2005, the Zonyl product line was generating about $100 million a year for Old DuPont.

176. As with its Teflon and Zonyl consumer products, Old DuPont's manufacturing, marketing, and sale of its Stainmaster brand of carpet fibers also led to significant releases of PFOA in New York.

177. In 1986, Old DuPont launched the Stainmaster brand, using PFOA to manufacture a fabric treatment that the company applied to nylon fibers and then sold to carpet mills.

178. After a nationwide advertising blitz by Old DuPont in the late 1980s, the company estimated that 400 million square yards of DuPont Stainmaster carpeting was on floors in the United States, and the brand was widely advertised and sold in New York. Old DuPont continued to manufacture and market the Stainmaster brand to New Yorkers until approximately 2004.

179. The DuPont Stainmaster carpet treatment contained PFOA as an impurity, and the final carpet treatment itself also readily degraded into PFOA and other PFAS through everyday use, wear, and cleaning.

180. Old DuPont's Stainmaster carpet treatment significantly contributed to, and continues to contribute to, human exposure to these compounds and the release of harmful PFAS into the environment.




181. In addition to PFOA, the breakdown of the Stainmaster fabric treatment also released other PFAS, including perfluorodecanoic acid ("PFDA"), perfluorododecanoic acid ("PFDoA"), and perfluoroundecanoic acid ("PFUnA") into the environment.

182. Old DuPont also manufactured, marketed, and sold Stainmaster fabric treatments to New York consumers designed to restore or replace damaged areas of stain resistance in carpets that also released PFOA as a breakdown product.

183. Like 3M, Old DuPont also functioned as an upstream supplier, selling PFAS-containing substances to other companies producing consumer goods of their own in New York.

184. During these decades, Old DuPont continued to reassure consumers and the public in its advertising and marketing that its consumer products manufactured with PFOA posed no risks to human health.

185. Even when 3M announced it would discontinue manufacturing PFOS and PFOA in the 2000s, Old DuPont was undeterred. Old DuPont ramped up its own production of PFOA and its precursors to replace the substances it previously bought from 3M.

186. In June 2005, Old DuPont asserted publicly that "no human health effects are known to be caused by PFOA." A member of Old DuPont's own Epidemiology Review Board called that statement "[s]omewhere between misleading and disingenuous."

187. In January 2006, Old DuPont announced it would gradually phase out PFOA production by 2015 as part of the EPA's 2010/15 PFOA Stewardship Program.

188. However, between 2006 and 2015, not only did Old DuPont continue to manufacture PFOA for use in consumer products sold in New York, but the

company also failed to warn consumers and the public against purchasing products that were on store shelves or using products that were already in homes. Old DuPont also failed to take reasonable efforts to inform or protect consumers and the public from the risks posed by consumer products containing its PFAS.

189. As negative publicity mounted in the mid-2000s, Old DuPont responded with an ad campaign in February 2006 designed to persuade the public and consumers that products manufactured with PFOA were safe. In the same month, Old DuPont's Epidemiology Review Board "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

190. In October 2006, again contrary to the advice of Old DuPont's Epidemiology Review Board, Old DuPont's issued another press release stating that "there are no health effects known to be caused by PFOA." A member of the Epidemiology Review Board again criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

191. In 2015, Old DuPont spun off its performance chemicals business into Chemours.

192. Old DuPont and then Chemours continued to manufacture PFOA and its precursors for consumer products until at least 2015.

193. Even as Old DuPont and subsequently Chemours scaled back their use and manufacture of PFOA, they did not cease their manufacture and use of harmful

PFAS. Instead, like 3M, Old DuPont and Chemours merely transitioned to the use of slightly different PFAS for the manufacture of consumer products.

194. Beginning in the late 2000s, Old DuPont, and subsequently Chemours, simply switched to PFAS containing a somewhat shorter perfluorinated carbon chain, including 6:2 FTOH and other PFAS, for use in consumer products.

195. Old DuPont concealed the similarity of these newer PFAS (including 6:2 FTOH, which degrades into PFHxA, and other six-chain PFAS) to the prior compounds that the company manufactured, failed to warn consumers and the pubic that these PFAS bore very similar characteristics to PFOA, and failed to warn consumers and the public that these compounds posed similar threats to human health and the environment.

**PFOA**



**6:2 FTOH**



**PFHxA**



F fluorine

C carbon

O oxygen

H hydrogen

196. Among other things, Old DuPont and Chemours manufactured 6:2 FTOH for use in a new version of their coating for food packaging. Even after learning in the early 2000s that certain breakdown products of 6:2 FTOH potentially bioaccumulated in living organisms, Old DuPont and Chemours continued to use 6:2 FTOH-based chemicals in food packaging for several more years.

197. Although Chemours did eventually agree to phase out the use of 6:2 FTOH for food packaging in 2019, in response to concerns raised by the U.S. Food and Drug Administration, the company again failed to address the existing stock that had already been distributed to third parties for sale to consumers. At that time, Chemours estimated that it would take another year for that stock to be depleted.

198. Old DuPont also manufactured, marketed, and sold a new line of indoor and outdoor surface treatments using these short-chain PFAS under the brand name "Capstone," developed to replace corresponding Zonyl products. Like their Zonyl counterparts, the Capstone brand included a wide variety of PFAS surface treatments designed to provide oil and water repellency for stone, tile, concrete, granite, marble, and other surfaces in residential and commercial settings. The products were advertised as appropriate for both inside and outside the home, and were widely available for purchase in New York.

199. Critically, Old DuPont also did not fully phase out the Zonyl version of its surface treatments until 2014; despite the known risks, the company waited to

discontinue each specific Zonyl product until the corresponding Capstone product was available to consumers.

200. Old DuPont and then Chemours continued to manufacture, market, and sell these Capstone consumer products, and other consumer products manufactured with short-chain PFAS until at least 2025.

201. Like PFOA before it, Old DuPont's and Chemours' 6:2 FTOH threatens human health and the environment. Not only is 6:2 FTOH itself toxic, but its breakdown products also include PFHxA and other PFAS.

202. When used in food packaging in particular, these compounds can migrate into food. And, when 6:2 FTOH is ingested, it is metabolized into PFHxA and other PFAS.

203. Similarly, the everyday use, washing, weathering, and disposal of consumer products, such as products coated Capstone surface treatments, releases PFAS into the environment.

204. Like 3M, the secrecy with which the DuPont Defendants have operated, and continue to operate, has prevented New York consumers and the public from identifying products manufactured with or containing PFAS. As a result, an unknown quantity of consumer products containing PFAS are still being produced and/or sold in New York.

### C. The Costs Incurred by the State in Addressing Contamination Caused by Defendants' PFAS in Consumer Products

205. Defendants' decades long manufacture, marketing, and sale of PFAS, including PFOS, PFOA, PFBS, 6:2 FTOH, PFHxA, and other PFAS, for use in

consumer goods sold, used, and disposed of in New York has led to widespread human exposure, both by consumers of these products and the public, and to environmental contamination.

206. Unbeknownst to the public and consumers, these products released PFAS into their homes and into the environment for decades, continuing to the present day in some cases.

207. These threats to the health of New Yorkers and to the environment have necessitated a wide-ranging legislative, regulatory, and enforcement response by the State.

208. Among other things, the State has expended significant resources to (i) protect New York residents from contaminated drinking water, (ii) identify, investigate and mitigate environmental contamination, and (iii) protect people from exposure to PFAS through consumption of contaminated fish caught in New York waters.

### i. Protecting New Yorkers from Contaminated Drinking Water

209. The everyday use, cleaning, and disposal of consumer products containing defendants' PFAS has led, and continues to lead, to the contamination of the State's drinking water, presenting a serious threat to public health.

<u>New York's Adoption and Enforcement of PFOS and PFOA Maximum Contaminant Levels</u>

210. In 2017, recognizing the urgent need to address PFAS contamination, New York enacted the Emerging Contaminant Monitoring Act to protect public

drinking water from these chemicals. DOH is responsible for the implementation and enforcement of the statute.

211. Among other things, DOH is tasked with identifying emerging contaminants on an ongoing basis and periodically evaluating whether it is necessary to set maximum contaminant levels for each of those substances. P.H.L. §§ 1112(3), (12).

212. Substances that are known or anticipated to occur in public water systems and "may cause physical injury or illness, or otherwise pose a potential hazard to human health when present in drinking water" are required to be included on the list of emerging contaminants if the substances are not already regulated. P.H.L. § 1112(3)(a).

213. When the law was enacted, the legislature required that both PFOS and PFOA be included on the initial list of emerging contaminants. P.H.L. § 1112(3)(c) (2017). In 2021, the legislature added PFBS and PFHxA to this list of designated emerging contaminants, along with PFDA, PFDoA, and PFUnA, among others. P.H.L. § 1112(3)(c) (2021).

214. For each substance on the emerging contaminant list, DOH is required to establish notification levels for the substance based upon the best available science. P.H.L. § 1112(6).

215. Public water systems operating in New York are required to test for substances on the emerging contaminants list at least once every three years and notify DOH within 24 hours if an emerging contaminant is found in drinking water

at concentrations at or above the set notification level. P.H.L. §§ 1112(4), (8). DOH then evaluates the risk and determines whether to require that the public water systems take action to reduce exposure. P.H.L. § 1112(d). If DOH determines that the concentration of the emerging contaminant constitutes an actual or potential threat to public health, DOH works in coordination with DEC to evaluate appropriate measures, including the use of funds made available under the Clean Water Infrastructure Act to address contaminated drinking water. P.H.L. § 1112(8)(d); E.C.L. § 27-1205(1).

216. For each substance on the emerging contaminant list, DOH also evaluates the substance to determine whether the implementation of an enforceable drinking water standard, known as maximum contaminant level ("MCL"), is necessary. P.H.L. § 1112(12).

217. In 2020, DOH adopted MCLs for both PFOS and PFOA in public drinking water, making New York one of the first states to develop its own health-based, enforceable drinking water standards for PFOS and PFOA.

218. Under the New York MCLs, the highest level of PFOS or PFOA allowed in drinking water is 10 parts per trillion ("ppt"). 10 NYCRR 5-1.52. These standards are among the lowest in the country and are highly protective against adverse health effects.

219. In coordination with local health departments, DOH monitors public water supplies to identify those with PFOA and PFOS levels above New York's

MCLs and to require public water systems to take action to remove PFAS from these water supplies.

220. The State also plays a role in addressing contamination in private wells. Although MCLs are not used to regulate PFAS in private drinking water wells, DEC uses these levels as guidelines to make recommendations to reduce exposures from private wells.

221. DOH also provides advice on PFAS testing, interpretation of sample results, and appropriate options to reduce PFAS exposures from private wells.

New York's Role in the Provision of Alternate Water to Affected Communities

222. When PFAS contamination is suspected in a community's drinking water, the State's first priority is to identify the affected water supply and evaluate whether an alternative water supply is needed to reduce exposure. This requires an investigation by the State into the nature and extent of the contamination, often including the sampling of both public water systems and private wells, surveys of commercial or residential properties, review of historical records, and mapping of relevant data to ensure all affected drinking water systems are identified.

223. If the State's investigation reveals that private wells have been impacted or threatened by contamination, DEC first attempts to ensure that alternate water supplies are offered to the private well owner. The State has expended significant funds to provide alternative water supplies in response to PFAS contamination, including the installation of point-of-entry treatment ("POET") systems, which use granular activated carbon to remove PFAS from water

as it enters a home from the main line, and the provision of bottled water. For larger public drinking water systems, the State uses mobile granular activated carbon units to treat the water.

224. POET systems are filtration units that treat water as it enters a home from the main line. To date, DEC has provided more than 2,400 homes and businesses statewide with alternate water supplies to address PFAS contamination, including approximately 2,200 POET systems. DEC regularly monitors and maintains the systems to ensure they continue to remove all contamination. State spending on this work has exceeded $100 million.

225. Recently, the State also launched a pilot program allowing residents in certain counties to apply for free PFAS testing; if the PFOA or PFOS levels are at or above the State's MCLs of 10 ppt, homeowners will be eligible for a rebate up to $5,000 for a PFAS water treatment system or up to $10,000 to connect to a public water supply.

226. In conjunction with the provision of alternative water supplies, the State also investigates the source of the contamination and determines the appropriate next steps, such as a referral to the State Superfund program.

<u>Protection of New York's Ambient Waters</u>

227. Effectively protecting the public from defendants' PFAS not only requires the mitigation or treatment of water that is already contaminated, but it also requires the State to implement and fund protections for the waters of the State more broadly, including lakes, rivers, streams, and groundwater.

228. In March 2023, DEC established guidance values for PFOS and PFOA in these waterbodies (also referred to as "ambient waters") for the protection of human health and aquatic life. Guidance values are typically set lower than drinking water MCLs to prevent contaminants from building up to levels that pose threats to human health and the environment.

229. For PFOS, the guidance value for New York ambient water serving as a source of drinking water is 2.7 ppt; for PFOA it is 6.7 ppt.

230. For PFOS, DEC also established a guidance value of 160 parts per billion ("ppb") for the protection of aquatic life. This guidance value applies even if the waterbody is not a known drinking water source.

231. Among other things, DEC uses these guidance values to set industrial discharge limits for the State Pollutant Discharge Elimination System ("SPDES") program.

232. Moreover, under recent guidance issued by DEC in December 2025, the State has significantly expanded its oversight of publicly owned treatment plants, i.e., municipal wastewater plants. These facilities are now required to provide certain data on PFAS in both incoming and outgoing water. This data allows the State to investigate and regulate the specific upstream sources responsible for PFAS contamination before it reaches drinking water.

State Funding for Local Water Quality Projects

233. In 2017, New York also enacted the Clean Water Infrastructure Act ("CWIA") to augment the State's ability to address a variety of threats to clean water in New York, including PFAS contamination. E.C.L. art. 27, tit. 12. Through

the CWIA, the State funds a wide range of projects necessary to protect New York's drinking water and modernize its infrastructure.

234. Among the CWIA's principal goals is funding remediation of PFAS and other emerging contaminants. For instance, through the Intermunicipal Grant program and the Water Infrastructure Improvement Act program, New York funds specific capital projects that remove PFAS from drinking water or address the source of the contamination. NYS Pub. Auth. Law ("PBA") §§ 1285-j and 1285-s.

235. Since its enactment, the State has allocated $5.5 billion to the CWIA.

**ii. Identifying, Investigating, and Mitigating Environmental Contamination**

236. Beyond protecting New York residents from contaminated drinking water, the State has undertaken costly efforts to mitigate environmental contamination caused by defendants' consumer products. These ongoing efforts include, among others, the Inactive Landfill Initiative, remediation of contaminated sites under the State Superfund program, a comprehensive rural background study to investigate soil contamination across the State, and efforts to address contaminated biosolids in New York.

<u>Inactive Landfill Initiative</u>

237. DEC is responsible for administering New York's Inactive Landfill Initiative, a program established as part of the CWIA in 2017. E.C.L. § 27-1201, *et seq*.

238. The goal of this program is to identify, mitigate, and remediate any solid waste site – including inactive landfills and sites where illegal disposal of solid

waste has taken place – causing or contributing to impairment of drinking water quality which may impact public health. E.C.L. §§ 27-1201(5), 1203.

239. The disposal of consumer products containing defendants' PFAS has led, and continues to lead, to significant contamination in New York landfills.

240. The statutory provisions governing the Inactive Landfill Initiative accordingly place a particular emphasis on the importance of addressing emerging contaminants, including PFAS, in landfills. E.C.L. §§ 27-1201, 1207. Among other things, the statute directs DEC to use up to $130 million from the CWIA specifically to address public drinking water affected by contaminated landfills and similar sites. E.C.L. § 27-1207.

241. Under this program, DEC has identified 1,211 sites that need groundwater investigations. DEC has completed investigations of 529 sites and is still evaluating hundreds more.

242. In its administration of this program, DEC has installed 1,222 monitoring wells, collected over 5,000 groundwater samples, and collected over 2,029 drinking water samples from people with private wells in the vicinity of inactive landfills.

243. The results of this work show that PFAS emanating from inactive landfills continue to impact drinking water supplies in New York. PFOS or PFOA have been detected in groundwater at 96% of the inactive landfill sites investigated, and at 68% of the inactive landfill sites investigated, the PFOS or PFOA levels in the groundwater exceed New York's MCLs of 10 ppt.




*PFOS or PFOA has been detected in 68% of the sampled inactive landfills at levels that exceed New York's maximum contaminant level of 10 ppt.*

244. For inactive landfill sites where concentrations in groundwater samples exceed the MCLs for PFOA or PFOS, DEC initiates the process for conducting sampling at potential receptor points (e.g., private and public drinking water supply wells), and DOH then reviews the water supply results, communicates the results to the owners, and develops recommendations for further actions for each location.

245. In instances where contaminants originating from landfill sites are found to be above the MCLs, the State's response actions can include the installation of point-of-entry treatment systems, the supply of alternative sources of drinking water, and/or additional monitoring.

246. In addition, impacted landfill sites are elevated to the Solid Waste Site Mitigation and Remediation Priority List when appropriate. DEC then further

assesses these sites to determine the impact on drinking water supplies and to establish a plan to remediate and/or mitigate the impacts of the PFAS contamination. As of March 31, 2025, DEC has concluded that the elevated levels of emerging contaminants, including PFOS and PFOA, found at 36 sites warranted transfer to DEC's Division of Environmental Remediation for further action.

247. Through March 31, 2025, the State has spent over $30 million administering the Inactive Landfill Initiative.

<u>Inactive Hazardous Waste Sites</u>

248. DEC also utilizes its authority under the Inactive Hazardous Waste Disposal Site Program (commonly referred to as the "State Superfund" program) to address PFAS contamination.

249. Under the State Superfund program, DEC is authorized to identify, investigate, and remediate sites where hazardous waste poses a significant threat to public health or the environment. E.C.L. § 27-1301, *et. seq*. Both PFOS and PFOA have been designated as hazardous substances under the State Superfund program since 2017, 6 NYCRR § 597.3, and the State has utilized its authority under this program to address sites contaminated by defendants' PFAS.

250. Under the State Superfund program, DEC's process begins with the identification of a potential hazardous waste site and follows a path of thorough investigation, remedy selection, design, construction, and monitoring.

251. If the presence of a hazardous waste is confirmed at a site, the site is added to the State's official list of sites (the "Registry of Inactive Hazardous Waste Disposal Sites"). Sites that represent a significant threat to human or

environmental health are listed on the registry as Class 2 sites. Through further investigation, DEC then determines the full nature and extent of the contamination and selects the appropriate remedy, a costly and burdensome undertaking.

252. At sites where responsible parties cannot be found or are unable or unwilling to fund an investigation and remediation, the State pays for the cleanup using money allocated under the New York 1986 Environmental Quality Bond Act, also known as the "State Superfund."

253. Utilizing this program, DEC has prioritized the identification of sites that are potential sources of PFAS that could threaten human health or the environment. For instance, the cleaning of carpets and fabrics treated with defendants' stain- and water-repellents has contributed to PFAS contamination at multiple former dry-cleaning sites in New York. And the use of PFAS processing aids manufactured by defendants, such as PFAS mist suppressants used at chrome plating sites and PTFE dispersion products used to coat fabrics, has led to contaminated light industry sites in New York.

254. To date, DEC has designated multiple sites with PFOS or PFOA contamination as Class 2 sites on the Registry and has thereby empowered the State to implement interim remedial measures while long-term cleanup strategies are finalized.

<u>DEC Rural Background Study for PFAS and the Development of Soil Cleanup Standards</u>

255. In 2023, DEC also undertook wide-ranging sampling and analysis of soil in a state-wide study called the Rural Background Study to evaluate the

background levels of PFAS in soil across the state. Soil samples were analyzed for 40 PFAS compounds, including PFOS, PFOA, PFBS, PFHxA, PFDA, PFDoA, and PFUnA.

256. PFOS was detected in over 97% of surface soil samples, and PFOA was detected in 76.5%. PFHxA, PFDA, and PFUnA were detected in over 20% of the samples, and PFBS was also detected at multiple sites.

257. DEC is now engaged in rulemaking to establish soil clean up requirements based upon the findings of the Rural Background Study. The proposed soil cleanup requirements are 3.0 ppb for PFOS and 1.5 ppb for PFOA.

Biosolids

258. The use, cleaning, and disposal of defendants' consumer products in homes and businesses has contaminated, and continues to contaminate, New York wastewater with PFAS. As a result, biosolids disposed of in landfills and spread on agricultural lands in New York have contributed to the contamination of New York soil and water.

259. For instance, the everyday use and cleaning of fabrics treated with 3M Scotchgard containing PFAS or of DuPont Stainmaster carpets directly contributed, and continues to contribute, to the release of PFAS into municipal wastewater systems. And, when present in wastewater, these compounds then contaminate the biosolids that are separated at wastewater treatment plants. As a result, biosolids used as fertilizer on New York's agricultural lands and disposed of in landfills have contributed to the contamination of soil and water in the State.

260. To address this threat to human health and the environment, in 2023 DEC's Department of Materials Management established Policy DMM-7 governing biosolids recycling in New York. Pursuant to this policy, all biosolids recycling facilities, e.g. those facilities that are recycling biosolids for land application use, must sample each biosolids source for PFOS and PFOA and report the results to DEC.

261. Under the DMM-7 policy, if the PFOS or PFOA levels are 50 ppb or greater, DEC will take action to prohibit biosolids recycling until the PFOS or PFOA concentration is below 20 ppb. If PFOS or PFOA are present at levels between 20 ppb and 50 ppb, DEC takes action to restrict recycling if the PFOS or PFOA levels are not reduced to below 20 ppb within one year.

**iii. Protecting New Yorkers Against PFAS Exposure Through Consumption of Fish Caught in New York**

262. DEC and DOH also jointly investigate and monitor PFOS levels in fish caught in New York's waters and, when necessary, issue "Do Not Eat" advisories to protect New Yorkers from exposure to PFAS through the consumption of fish.

263. Each year, DEC collects and analyzes contaminants in approximately 1,500 fish from more than 50 waterbodies in New York. In undertaking this task, DEC focuses on waterbodies with known or suspected contamination and popular fishing waters, among other considerations.

264. After DEC provides the analytical results, DOH reviews the data to determine whether to issue, revise or remove a health advisory.

265. The fish consumption guidelines utilized by DOH for this purpose were developed through the work of the Great Lakes Consortium for Fish Consumption Advisories, a collaborative workgroup of government agencies from states bordering the Great Lakes, the province of Ontario, and tribal nations. As part of the workgroup, researchers from New York analyzed a dataset of over 5,500 fish samples covering 80 species across 230 locations, supplemented by an evaluation of 1,292 fish samples from New York waterbodies.

266. The resulting fish consumption guidelines take both known chemical toxicity levels and typical fish consumption rates into account. For any fish species in a specific waterbody showing PFOS levels equal to or greater than 40 ppb, DOH issues a strict "Do Not Eat" advisory. In cases where PFOS contamination levels are equal to or greater than 10 ppb, but less than 40 ppb, DOH issues an advisory recommending that people limit their intake to no more than one meal per month.

267. To expand its analytical capacity and enable DOH to issue the relevant advisories, the State has invested significant funds to upgrade its facilities and acquire the equipment necessary for this large-scale PFAS testing. In addition, this work has required the State to set aside funds for external laboratories when DEC facilities reach their capacity.

***

268. The financial and administrative burdens that the State already faces are substantial, but these costs represent only a fraction of what the State will ultimately pay. As the State's investigatory and technical efforts continue, as it

learns more about consumer products containing defendants' PFAS, and as the toxicological science evolves, the State's burdens will only increase.

269. Among other things, the State is only beginning to understand the long-term public health costs of exposure to PFAS. The burden on the State's healthcare infrastructure and social services is poised to escalate given the link between PFAS exposure and various cancers, immune system disorders, and developmental issues. According to one analysis, New York could face between $2.7 billion and $4.4 billion in additional healthcare costs alone.

**D. The Enduring Damage to New York's Natural Resources**

270. Beyond the financial and administrative burdens imposed on the State, the use of defendants' PFAS in consumer products has also inflicted long-lasting harm on the natural resources of New York.

271. The State's natural resources include surface waters encompassing more than 70,000 miles of rivers and streams, approximately 7,600 lakes and ponds, and numerous reservoirs. Surface waters serve as a primary source of drinking water for millions of people and are central to New York's identity and economy, supporting robust commercial and recreational fishing, boating, and tourism. Similarly, New York's groundwater provides drinking water for approximately a third of the State's residents.

272. The State's natural resources also include abundant fish and wildlife, resources that New Yorkers and visitors utilize for tourism, recreation, fishing, hunting, and wildlife watching, activities that also generate billions of dollars in

annual revenue for the State. Fish, other marine resources, and wild game also serve as essential food sources for many communities.

273. As for New York's sediments and soils, these natural resources are essential to a functioning ecosystem, acting as the primary site for nutrient cycling and providing the base of the food chain for both terrestrial and aquatic habitats.

274. New York's groundwater, surface water, sediments, and soils, as well as the State's fish and wildlife have all been adversely impacted by defendants PFAS that was used in consumer products.

275. For instance, these contaminants have significantly impacted New York's water and threaten the long-term viability of the State's subsurface water reserves. Even a localized discharge, such as from landfill leachate, can eventually contaminate groundwater, downstream reservoirs and even distant coastal estuaries, broadening the geographical scope of the damage and complicating remediation efforts.

276. Research has also shown that PFAS can interfere with reproduction, growth, and immune function in various aquatic and terrestrial species. In New York, testing has confirmed the presence of PFAS in a wide range of fauna, including various species of freshwater fish and terrestrial mammals like deer.

277. And, when PFAS contaminate soil and sediment, this becomes a perpetual source of further release into the environment; rain and agricultural irrigation cause these chemicals to leach into New York's waters over time, carrying them throughout the waters of the State and deeper into groundwater tables.

278. Despite the State's extensive efforts, some of these harms cannot be remedied in the near term. This damage will deprive generations of New Yorkers the full benefit of their natural resources.

**FIRST CAUSE OF ACTION**

**Public Nuisance**

279. Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

280. Defendants' acts and omissions have created or contributed to, and continue to create and contribute to, a substantial interference with the exercise of a common right of the people living in New York, interfering with the use by the public of public spaces, and endangering and injuring the property, health, safety, and comfort of a considerable number of persons.

281. Defendants' manufacture of PFAS for use in consumer products, their marketing and sale of these products, and their failure to implement reasonable efforts to inform and protect consumers and the public from their harmful products, has caused and contributed to threats to human health and widespread, ongoing environmental contamination.

282. Beyond the financial and administrative burdens imposed on the State by defendants' conduct, PFAS contamination from defendants' consumer products has also inflicted long-lasting harm on the natural resources of New York, including public lands held in trust by the State, property owned by the State and all natural resources of the State.

283. Defendants knew, or had reason to know, that their actions and omissions would result in this offense, interference, and/or damage to the public in the exercise of common rights.

284. Despite extensive efforts by the State, the offense, interference, and/or damage to the public in the exercise of common rights caused by defendants' actions and omissions remain largely unabated.

**SECOND CAUSE OF ACTION**

**Strict Products Liability: Failure to Warn**

285. Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

286. At all relevant times, the PFAS manufactured by defendants for use in consumer goods created a substantial risk of harm to human health and the environment.

287. At all relevant times, New York consumers and the public were not aware of the nature or extent of the risks posed by defendants' PFAS in consumer goods.

288. Defendants have failed, and continue to fail, to adequately warn their consumers and the public of the known and foreseeable risks that follow from the intended use and foreseeable misuse of consumer products containing defendants' PFAS.

289. Defendants knew, or should have known, that consumer products manufactured with defendants' PFAS, whether used as intended or misused in a foreseeable manner, would cause harm to the People of the State of New York and

the natural resources of New York, including public lands held in trust by the State, property owned by the State, and all natural resources of the State.

290. Defendants' failure to warn has injured the People of the State of New York and caused harm to the natural resources of New York, including public lands held in trust by the State, property owned by the State, and all natural resources of the State.

## THIRD CAUSE OF ACTION

### Deceptive Acts or Practices in Violation of New York General Business Law § 349

291. Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

292. Defendants engaged, and continue to engage, in deceptive acts or practices in the conduct of business, trade, and/or commerce in New York, in violation of § 349. Defendants manufactured harmful PFAS for use in consumer products, deceptively marketing these products as safe and failing to warn consumers and the public of the risks posed by these products. Defendants have repeatedly given consumers, and the public, false and misleading statements regarding the purported safety of the use of their PFAS in consumer products and omitted material information regarding the risks posed by those products.

293. Defendants' representations and omissions were likely to mislead a reasonable consumer acting reasonably under the circumstances.

294. By letter dated June 26, 2026, the Attorney General timely provided defendants with a pre-litigation notice.

## FOURTH CAUSE OF ACTION

### Abusive Acts or Practices in Violation of New York General Business Law § 349

295. Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

296. Defendants engaged, and continue to engage, in abusive acts or practices in the conduct of business, trade, and/or commerce in New York, in violation of § 349.

297. Through their communications and advertising regarding the use of PFAS in consumer products, defendants materially interfered, and continue to materially interfere, with the ability of consumers and the public to understand the characteristics of defendants' PFAS that were used in consumer products and the risks posed by those products.

298. Defendants' communications and advertising also took unreasonable advantage of a lack of understanding on the part of consumers and public as to the material risks, costs, or conditions of consumer products containing PFAS.

299. Separate from their statements concerning PFAS in consumer goods, defendants' manufacture, production, and sale of PFAS for use in consumer products, also took unreasonable advantage of a lack of understanding on the part of consumers and the public about the material risks, costs, or conditions of consumer products containing PFAS, as well as consumers' and the public's inability to protect their interests.

300. By letter dated June 26, 2026, the Attorney General timely provided defendants with a pre-litigation notice.

## FIFTH CAUSE OF ACTION

### Unfair Acts or Practices in Violation of New York General Business Law § 349

301. Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

302. Defendants engaged, and continue to engage, in unfair acts or practices in the conduct of business, trade, and/or commerce in New York, in violation of § 349.

303. The manufacture and sale of PFAS for use in consumer products has caused, and is likely to cause, substantial injuries to human health and the environment, and (by diminishing the value of the products in which they are incorporated) substantial economic injuries to the owners of such products. Because of the persistence and mobility of certain PFAS manufactured and sold by defendants for use in consumer products, these injuries are not reasonably avoidable.

304. Any countervailing benefits of the use of PFAS in consumer products were vastly outweighed by the substantial injuries that have been, and continue to be, inflicted on consumers.

305. By letter dated June 26, 2026, the Attorney General timely provided defendants with a pre-litigation notice.

## SIXTH CAUSE OF ACTION

### False Advertising in Violation of New York General Business Law § 350

306. Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

307. Defendants engaged, and continue to engage, in deceptive advertising in violation of § 350. Defendants manufactured harmful PFAS for use in consumer products, deceptively marketing these products as safe. These advertisements were materially misleading, in that they were calculated to, and did, mislead a reasonable consumer acting reasonably under the circumstances.

308. By letter dated June 26, 2026, the Attorney General timely provided defendants with a pre-litigation notice.

## SEVENTH CAUSE OF ACTION

### Repeated and Persistent Fraudulent Acts in Violation of New York Executive Law § 63(12)

309. Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

310. Defendants have engaged in repeated and persistent fraud in violation of Executive Law § 63(12) in the course of their manufacture of PFAS for use in consumer goods distributed and sold in New York and in the course of marketing and selling these products, including by making false statements and omissions regarding the risks to public health and environment posed by the use of their PFAS in consumer goods.

311. Defendants damaged the State of New York and its residents, and

obtained ill-gotten profits, through their repeated and persistent fraud in violation of Executive Law § 63(12).

**EIGHTH CAUSE OF ACTION**

**Repeated and Persistent Illegality in Violation of New York Executive Law § 63(12)**

312. Plaintiffs reallege and incorporate by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

313. Defendants have engaged in repeated and persistent illegality in violation of Executive Law § 63(12) through their violations of New York General Business Law § 349.

314. Defendants damaged the State of New York and its residents, and obtained ill-gotten profits, through its repeated and persistent illegality in violation of Executive Law § 63(12).

WHEREFORE, the People of the State of New York respectfully request a judgment that:

1. Declares that defendants' manufacture of PFAS for use in consumer products, and the marketing and sale of these products, as described herein, has caused and contributed to harms to human health and the environment in the State;

2. Declares that the harms to human health and the contamination of the environment in the State caused by defendants' manufacture of PFAS for use in consumer products, as described herein, are public nuisances;

3. Declares that defendants failed to adequately warn consumers and the public in New York that consumer goods manufactured with their PFAS posed threats to human health and the environment;

4. Declares that defendants have violated General Business Law § 349, by engaging in deceptive, unfair, and/or abusive acts and practices in the conduct of business, trade, or commerce;

5. Declares that defendants have violated General Business Law § 350, by engaging in false advertising in the conduct of business, trade or commerce;

6. Declares that defendants have violated Executive Law § 63(12) by engaging in repeated and persistent fraudulent acts, as well as repeated and persistent illegality in the carrying on, conducting, and transaction of business;

7. Enjoins defendants to take reasonable best efforts to abate the public nuisance described herein, by (i) undertaking additional studies as needed to identify the extent of the contamination described herein and identifying and undertaking appropriate actions to remediate the contamination, or (ii) endowing an abatement fund with sufficient capital to abate the public nuisance to which they have contributed and continues to contribute;

8. Enjoins defendants to take reasonable best efforts to prevent further releases of harmful PFAS in the State;

9. Enjoins defendants to adequately warn consumers of the risks of harm posed by their PFAS in consumer products, including the threats to human health and the environment;

10. Enjoins defendants from causing the sale or distribution of any consumer product containing harmful PFAS that does not (i) identify any intentionally added PFAS, as well as any PFAS that are known byproducts, impurities, or breakdown products, and (ii) contain an adequate warning regarding the risks posed by the PFAS;

11. Enjoins defendants from engaging in any further violations of General Business Law §§ 349 or 350, including concealing or misrepresenting any threat to human health or the environment posed by defendants' PFAS in consumer goods;

12. Enjoins defendants from engaging in any further fraudulent acts in violation of Executive Law § 63(12), including concealing or misrepresenting any threat to human health or the environment posed by defendants' PFAS in consumer goods;

13. Awards compensatory damages for the harm done to the State, and the citizens and inhabitants of State, including but not limited to damages for injury to natural resources, in an amount to be determined at trial;

14. Awards plaintiff, pursuant to General Business Law §§ 349(b) and 350-d, restitution and civil penalties from defendants in the amount of $5,000 for each separate instance in which they violated General Business Law §§ 349 or 350;

15. Orders disgorgement of all revenues, profits, and gains wrongfully obtained by defendants on account of their repeated and persistent unlawful acts or practices in violation of Executive Law § 63(12) and General Business Law §§ 349 and 350; and

16. Grants such other and further relief as the Court may deem just and proper.

Dated: New York, New York
July 9, 2026

LETITIA JAMES
New York Attorney General
*Attorney for Plaintiffs*

By: ______________________
Jennifer C. Simon
Assistant Attorney General
Environmental Protection Bureau
Office of the New York Attorney General
28 Liberty Street, 19th Floor
New York, New York 10005

Kyle Burns
Assistant Attorney General
Environmental Protection Bureau
Office of the New York Attorney General
28 Liberty Street, 19th Floor
New York, New York 10005

Sabita Krishnan
Assistant Attorney General
Environmental Protection Bureau
Office of the New York Attorney General
28 Liberty Street, 19th Floor
New York, New York 10005

Brendan McGrath
Assistant Attorney General
Environmental Protection Bureau
Office of the New York Attorney General
The Capitol
Albany, New York 12224